26665. ATLANTIC COAST LINE RAILROAD COMPANY
*et al. v.* HEATH.

DECIDED MARCH 11, 1938. ADHERED TO ON REHEARING APRIL 1, 1938.

*Abrahams, Bouhan, Atkinson & Lawrence, W. E. Kay, M. Price, F. R. Youngblood, O. C. Darsey,* for plaintiffs in error.

*W. C. Hodges, Highsmith & Highsmith,* contra.

STEPHENS, P. J. Mrs. Ruth L. Heath sued the Atlantic Coast Line Railroad Company and T. D. Boone, alleging that on February 25, 1936, at about 7:40 a. m., at a point on the railroad tracks of the company opposite the residence hereinafter referred to, the eleven-year-old son of the plaintiff was killed by being struck by the front engine of a train of the defendant company, which was in the full management and control of the co-defend-

ant, T. D. Boone, the engineer; that the plaintiff's husband was in the employ of the defendant railroad company as section foreman in the locality of the homicide; that since 1926 the plaintiff, her husband, and two sons had been living in the section foreman's house provided by the company on the west side of the railroad track about one and one quarter miles north of the station of McIntosh, with the exception of the years 1930 to 1934 inclusive; that at the place in question the company's line of railroad ran north and south and was double-tracked, and for more than a mile in either direction from the plaintiff's home the tracks were entirely straight except with a slight curving out of the west main line about one thousand feet north of the place of the homicide, which curve did not in any way obstruct or interfere with the view; that the tracks were a half mile or more on either side, and directly in front of the plaintiff's residence, are upon an embankment about forty-five feet in width and about eight feet high, and on the embankment there were located three sets of tracks, a main-line track on the east side of the embankment, a main-line track on the west side of the embankment, and in between these two main-line tracks there was a passing track extending from near McIntosh station up to and about five hundred feet beyond the location of the section house; that there was no road or outlet from the section foreman's house, which was approximately three hundred feet from the tracks, except the walkway that led from the house to and up on the embankment on which the tracks were located; that the company, recognizing the necessity of a way for its employees and their families out and from said place of residence, and as a necessary and convenient means of traveling in going from said residence to the car house, and to the station of McIntosh, and as a necessary means of crossing said roadbed and tracks, has caused to be constructed a bridge across a wide ditch between the embankment and the residence, and to be provided steps up said embankment by placing ties to be used as steps from the bottom of the embankment up to and upon the roadbed, and has since maintained the same with the intent that the roadbed should be used as a means of travel between the said place and the car house and said station; that on the east side of the roadbed there were two section houses provided by the company for its hands working on said section and their families, and on said east

side there were provided steps up the embankment for the convenience of persons going to and from the car house and the station of McIntosh, and in crossing said roadbed and tracks; that the only means provided by the company, and the only way of going to and from the car house, was to go up on said embankment and walk down the roadbed; that the company has never withdrawn its implied permission and invitation to use the roadbed as a walkway between the steps and the car house and the station of McIntosh, nor made any objection to its being used as such; that for at least ten years the roadbed has been constantly used by employees and their families, as a walkway between where steps go up the embankment and said car house and the station of McIntosh, without objection by the company, and was so used at the times herein mentioned, and has been constantly used by other residents of the community as a walkway, all of which was well known to the defendants; that "throughout the year 1935 that petitioner lived with her children and husband" in the section house, and on every school-day morning and afternoon, and when not occasionally hindered, her two sons have traveled mornings and afternoons back and forth from their home up to and upon the roadbed, and along and upon the same in the mornings at about the same hour the homicide occurred, to McIntosh for the purpose of catching the school bus to be taken to school at Hinesville, in the afternoons returning to their home, a fact well known to the defendants; that on the morning of the homicide the plaintiff's son, Noah, left home in the usual way at about the usual time, 7:30 o'clock, for the purpose of going to McIntosh to catch the school bus, and having been preceded about ten minutes by his father who had gone to the car house; that as her son was leaving she told him that if his father had not left the car house to get from his father the money with which to purchase his school lunch; that the son went down the walkway from the house and up the steps of the embankment and on to the roadbed, in the usual and customary way, with the intention of crossing the said west track and then proceeding down the passing track to the car house and on to McIntosh, the plaintiff having told her son to walk upon said passing track instead of upon the main-line track; that as her said son came upon the embankment and stepped up on the ends of the ties of the west track, and turned in an angle towards the car house, and was facing

in that direction, a long freight train of some sixty or seventy cars, running at a speed of twenty-five to thirty miles an hour, was approaching from the south on the east track, and was just about at the point of passing him; that the attention of her said son was attracted to and arrested by said freight train, which caused him to pause and he did pause for a few minutes on the end of said ties watching the approach and passage of this train; that the attention of her said son was so engrossed by the passing freight train that he was unaware of the approach from his rear of a passenger train on the west track going south; that as her son thus stood, paused on the end of the ties with his back to the approaching passenger train, and with his attention concentrated upon the passing freight train, he was run upon and killed by the engine of the passenger train; that the son, a youth of tender years at the time, was in the exercise of such care as his capacity, mental and physical, fitted him for exercising in the actual circumstances of the acts and situation under investigation, and due to his tender age and to his attention being so engrossed by the passing freight train, he was wholly unconscious of the possible approach of another train from the opposite direction, and particularly of any danger of the approach of another train without any warning signal; that when her son came upon the roadbed and stepped upon the ends of the ties the passenger train was then in sight, and the usual noise of the passenger train as it approached was drowned by the noise of the passing freight train; that no whistle was blown or other alarm given to warn the plaintiff's son of the approaching train from his rear; that the position of the engineer on said train was on the same side as was her son, and from his position the engineer, if he had been on the lookout, could have seen the plaintiff's son for at least five or six hundred yards before he was struck by the engine; that her son was looking south in the opposite direction from the approaching passenger train, and looking intently at the passing freight train, to such an extent as to be clearly seen and known by one looking at him; that his attention was concentrated on the passing freight train, and that he was unaware of the approaching passenger train, and was so seen, and if not so seen and so known by the engineer, it could only have been because the engineer was not looking out ahead; that the engineer was aware of the daily use of the walkway leading upon the embankment by the

plaintiff's sons, the section hands, and others, as a walkway from where the steps came up the embankment to the car house and the station of McIntosh; that as the train approached the place it was being run at a high rate of speed not less than fifty or sixty miles an hour; that the engineer driving the train at said high rate of speed continued at the same speed until the plaintiff's son was struck and killed, without slackening the speed of the train, without having the same under control, without keeping a lookout ahead, and without blowing the whistle; that the son was a bright boy, enjoyed excellent health, and had a reasonable expectancy of life of at least sixty years; that the plaintiff was dependent on the son for support, and he contributed to her support by performing various household duties, and his services were worth not less than $5 a week, and there was a reasonable prospect of his earning capacity increasing by the time of his majority to from $100 to $200 per month.

The petition further alleged that the defendants were jointly and concurrently negligent in running the train at said high rate of speed at the time and place in question, in running the train at said high rate of speed without having the same under control as it approached and as it passed over the place of the homicide, in running the train at the time and place in question without anticipating the presence of the plaintiff's son on the roadbed, in running the train at the time and place in question without keeping a lookout ahead for the purpose of discovering the presence of the plaintiff's son, in running the train without blowing the signal whistle and without sounding a sufficient alarm to put the plaintiff's son on notice of the approach of the train as it came upon him from his rear, in running the train in said manner and at said high rate of speed without seeing that the plaintiff's son was intently looking at the freight train, that his attention was concentrated upon the same, and that he was unaware of the approach of the passenger train, and in not running the train so as to avoid the injury of plaintiff's son or other person being upon the track and roadbed.

The defendants demurred to the petition on the ground that it set out no cause of action, and on a number of special grounds, one of which was that the petition affirmatively showed that the proximate cause of the homicide was the negligence of the plaintiff in

directing her son to go upon the railroad track, and the negligence of the son in standing on the main line of the railroad in the way of trains and locomotives using the main-line tracks. Both defendants answered the petition, denying liability and other allegations, and setting up the negligence of the plaintiff and that of her son as a bar to recovery. The demurrers were overruled and exceptions pendente lite taken. The case was tried and the jury found a verdict of $12,500 in favor of the plaintiff. The defendants filed a joint motion for new trial on general and special grounds, which motion was overruled. The defendants filed a joint bill of exceptions assigning error on the overruling of their demurrers and on the overruling of their motion for new trial.

The evidence for the plaintiff tended to support all the material allegations of the petition. There was a conflict of testimony as to the blowing of the whistle by the engineer. The engineer testified that as he was righting himself from the curve, he saw the little boy at a distance of about five hundred and sixty feet; that he (the engineer) had his hand on the throttle, he shut it off and grabbed the whistle cord in his left hand, and the emergency brake in his right hand, and there was nothing else he could do to the train to stop it; that the train going at seventy miles an hour could not be stopped in less than a half mile. He also testified: "I might have seen these boys using the right of way, but I can't remember seeing them. On a few trips I might have passed a few negroes walking the roadbed there in the daytime . . possibly I did notice some people on the track there using it as a walkway when I was on the freight. . . I have seen them on both sides of the track and walking the sidetrack. It was colored people doing that, in the summer. I don't remember ever seeing any boys do that, possibly I did."

■ A railroad company is bound to use ordinary care in the operation of its trains so as to avoid injuring persons who are liable to be struck by them. There are two principles which completely cover and control the present case. The first of these is that where a railroad company permits or invites or allows pedestrians to use the tracks or right of way as a walkway for a long period of time, and it is so used, a duty may arise requiring the railroad company to anticipate the presence of pedestrians on its tracks, and to use ordinary care in the running of its trains so as not to

injure such persons. In some cases this duty may require the company to slacken the speed of the train on approaching such places. *Western & Atlantic Railroad* v. *Michael*, 175 *Ga.* 1 (165 S. E. 37); *Western & Atlantic Railroad* v. *Meigs*, 74 *Ga.* 857; *Bullard* v. *Southern Railway Co.*, 116 *Ga.* 644 (43 S. E. 39). See also Rocco *v.* Lehigh Valley Railroad Co., 288 U. S. 275 (53 Sup. Ct. 343, 77 L. ed. 743).

■ The other principle involved is that in determining whether a person on or near a railroad track was in the exercise of ordinary care at the time of being injured, the jury may consider the circumstance that the attention of a person in a position of danger might be distracted from the danger and absorbed in giving attention to the movements of another train than the one which caused the injury. *Goswick* v. *Western & Atlantic R.*, 54 *Ga. App.* 164 (187 S. E. 205). See *Southern Ry. Co.* v. *Slaton*, 41 *Ga. App.* 759 (3) (154 S. E. 718); *Western & Atlantic R.* v. *Michael*, 44 *Ga. App.* 503 (162 S. E. 294). The question whether the plaintiff's son used ordinary care and the question whether the company failed to use ordinary care were for a jury. The plaintiff in error contends that the deceased was a mere licensee in going on the premises of the company, and that the only duty of the company was not to injure him wantonly or wilfully. That rule is not applicable to the present case as will be seen from the decisions already cited.

■ It is contended that the plaintiff can not recover because of negligence in permitting and directing her son to go across the track at the time and place that he was killed. In another contention the plaintiff in error claims that the son, despite his youthful age, was fully capable of understanding and avoiding the danger to which he subjected himself. There is some inconsistency in these two contentions. It has been held, however, that a mother is not necessarily guilty of negligence in allowing her twelve-year-old son to go to school unattended, even though his route may take him into a place of danger. *Western & Atlantic Railroad* v. *Michael*, 44 *Ga. App.* 503, 509 (162 S. E. 294). See also *Savannah Electric Co.* v. *Thomas*, 30 *Ga. App.* 405, 419 (118 S. E. 481); *Southern Railway Co.* v. *Hollaran*, 51 *Ga. App.* 910 (181 S. E. 709). It is also contended that a verdict for the defendant was demanded by the evidence because it did not show any negligence

by the engineer. In view of the speed of the train, which was shown to be about seventy miles an hour, and the conditions subsisting at the time and place, and the fact that there was a conflict in the evidence as to the blowing of the whistle by the engineer, it can not be said that there was no evidence from which the jury could find that the defendants were negligent.

■ It is contended that the court erred in charging the jury about dependency of the mother on the child, by not charging them that in order to recover the plaintiff must have been substantially dependent, and the child must have materially contributed to her support. It does not appear that any request was made to charge to this effect. The court charged the jury in the language of the Code, which was sufficient in the absence of any request for a more particular instruction.

■ It is contended that the court erred in charging that unless the plaintiff was entitled to recover against both defendants she should not be entitled to recover against either. This instruction was rather in favor of than against the defendants. This was not error. *Southern Railway Co.* v. *Harbin,* 135 *Ga.* 122 (68 S. E. 1103, 30 L. R. A. (N. S.) 404, 21 Ann. Cas. 1011); *Salmon* v. *Southern Railway Co.,* 137 *Ga.* 636 (73 S. E. 1062); *Southern Ry. Co.* v. *Smith,* 55 *Ga. App.* 689 (191 S. E. 181). It is contended that the court encroached on the province of the jury in charging as to the negligence of the plaintiff in not attending her son on his way to school, and in allowing him to take his customary route to school. In this part of the charge the court said: "The death of the child would not be said to be attributable to the negligence, if any, of the plaintiff within the meaning of the rule of law that would preclude her from recovering, if otherwise entitled to recover, unless you find, as a matter of fact, that the death of said child was due to negligence of plaintiff." Taken as a whole, and in connection with the entire charge, this instruction did not take away from the jury the question of the plaintiff's negligence. See paragraph 2, supra. The meaning of this part of the charge, taken alone, is that the plaintiff, under the circumstances recited by the court, would not be held negligent as a matter of law, but the jury could find as a matter of fact that she was negligent. It is contended that the charge was unfair in that the contentions of the defendants are not stated, especially their con-

tention that the plaintiff herself was guilty of such negligence as barred her from recovering. The charge of the court as given sufficiently covered all the contentions of the parties, and was eminently fair to the defendants. The requests to charge set out in the 14th, 15th, and 16th grounds of the motion for new trial were covered by the charge, and in view of what has already been said do not furnish any ground for setting the verdict aside.

■ It is complained that the verdict is excessive. The amount of the verdict is peculiarly a jury question. The trial court has approved this verdict, and this court can not say it is so excessive as to show bias and prejudice on the part of the jury.

The petition stated a cause of action, and was not demurrable on any ground urged against it. The evidence authorized the verdict. The court did not err in overruling the demurrers or in overruling the motion for new trial.

*Judgment affirmed.  Sutton and Felton, JJ., concur.*

### ON REHEARING

STEPHENS, P. J.  It is insisted on the motion for rehearing that Code, § 105-402, applies to persons who are injured on the right of way of a railroad by the running of a train. This section seems to have been taken from *Petree* v. *Davison-Paxon &c. Co.*, 30 *Ga. App.* 490 (118 S. E. 697), which was a case of a child injured in a store. Other Georgia cases cited in support of this contention relate to the general duty of a landlord to keep the premises safe. Therefore it may be doubted whether the Code section cited applies at all to such an injury as is involved in the present case. But this court has said, in speaking of licensees: "The fundamental concept in this class of cases, as in that of trespassers, is of a liability only for wilful or wanton injury; but it is usually wilful or wanton not to exercise ordinary care to prevent injuring a person who is actually known to be, or reasonably is expected to be, within the range of a dangerous act being done." *Mandeville Mills* v. *Dale*, 2 *Ga. App.* 607 (58 S. E. 1060), quoted in *Petree* v. *Davison-Paxon Co.*, supra. See also *Cook* v. *Southern Railway Co.*, 53 *Ga. App.* 723, 726 (3) (187 S. E. 274).

Under these decisions and the evidence in this case it was for the jury to find whether the failure to use ordinary care in the operation of the train (if any) amounted to wanton or wilful conduct.

It is also insisted that to require a company to reduce the speed of its through trains at such places as the one where the homicide in this case occurred would be to put an unreasonable burden on interstate commerce. The case of S. A. L. Ry. v. Blackwell, 244 U. S. 310 (37 Sup. Ct. 640, 61 L. ed. 1160, L. R. A. 1917F, 1184), in which the Georgia blow-post law was held unconstitutional, is cited. This question is without the purview of the present case. In a prior case in which the blow-post law was attacked it was held that proper pleadings and evidence were necessary. Southern Ry. Co. v. King, 217 U. S. 524 (30 Sup. Ct. 594, 54 L. ed. 868). Under this decision the constitutional question could hardly be considered. In the present case there is no attack on any statute or ordinance as unconstitutional.

*Judgment adhered to. Sutton and Felton, JJ., concur.*